NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**JAMES L. PATEREK, in his own right and as best friend of, J.P.,**
*Petitioner-Appellee,*

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellant.*

_____

2012-5078

_____

Appeal from the United States Court of Federal Claims in No. 02-VV-411, Judge Susan G. Braden.

_____

Decided: June 19, 2013

_____

JOHN F. MCHUGH, of New York, New York, argued for petitioner-appellee.

JOSHUA PAUL WALDMAN, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellant. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, and THOMAS M. BONDY, Attorney.

Before DYK, SCHALL, and PROST, *Circuit Judges.*

SCHALL, *Circuit Judge*

## DECISION

The Secretary of Health and Human Services (the "government") appeals the judgment of the United States Court of Federal Claims that reversed and remanded the Special Master's denial of a claim for compensation filed by Mr. James L. Paterek (the "Petitioner") under the Vaccine Act. *See Doe 21 v. Sec'y of Health and Human Servs.*, 88 Fed. Cl. 178 (2009) (the *"Final Decision"*). Because the Special Master properly denied the Petitioner's claim, we *reverse* and *remand* with instructions to affirm the Special Master's determination that the Petitioner is not entitled to compensation and to enter judgment for the government.

## DISCUSSION

### I. CASES UNDER THE VACCINE ACT

Under the Vaccine Act, *see* 42 U.S.C. §§ 300aa-1 to 300aa-34, a petitioner seeking compensation may prove causation in one of two ways, depending on whether the case involves "Table injuries" or "off-Table injuries." *See Moberly v. Sec'y of Health and Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010). First, if the administered vaccine and injury are listed in the Vaccine Injury Table, and the injury manifests itself within the specified time period, a petitioner receives a presumption of a causal link between the vaccination and the injury. *See de Bazan v. Sec'y of Health and Human Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008); *see also* 42 U.S.C. § 300aa-11(c)(1)(C)(i) (not requiring a showing of causation for a Table injury); 42 U.S.C. § 300aa-14(a) (initial Vaccine Injury Table); 42 C.F.R. § 100.3 (current Vaccine Injury Table). Second, for injuries not listed in the Table, or

which do not occur within the specified time period, a petitioner seeking compensation must prove causation-in-fact. *See de Bazan*, 539 F.3d at 1351; *see also* 42 U.S.C. § 300aa-11(c)(1)(C)(ii) (requiring a showing of causation for an off-Table injury). This appeal involves only an alleged off-Table injury. To prove that a vaccination caused an off-Table injury, a petitioner must demonstrate, by a preponderance of the evidence, the following three prongs:

> (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Althen v. Sec'y of Health and Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). If a petitioner establishes a prima facie case, the burden shifts to the government to establish an alternative causation by a preponderance of the evidence. *See Walther v. Sec'y of Health and Human Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007); *see also* 42 U.S.C. § 300aa-13(a)(1)(B) (noting that compensation will not be awarded if the injury "is due to factors unrelated to the administration of the vaccine"). If the government fails to do so, the petitioner is entitled to compensation.

## II. FACTS AND PRIOR DECISIONS

The Petitioner seeks compensation for a diphtheria-tetanus-acellular pertussis ("DTaP") vaccination that allegedly caused developmental delays in his son, J.P. On July 20, 1999, J.P. received the vaccination at his two-month well-baby examination. *See Doe 21 v. Sec'y of Health and Human Serves.*, No. 02-0411V, 2009 WL 3288295, at *1 (Fed. Cl. Jan. 16, 2009) ("*Special Master*

*Decision*").[1]   At that examination, the treating pediatrician described J.P as "healthy" and noted, regarding gross motor development, that J.P. could "roll[] to side."  Later that evening, J.P. was admitted to the emergency room after having what the government has conceded was an adverse reaction—more specifically, a hypotonic-hyporesponsive episode ("HHE")—to the DTaP vaccine. *See id.* at *2.  During this episode, J.P had crossed eyes and a fever, but was described as alert and in no acute distress.  *See id.*  He was discharged approximately 75 minutes later in satisfactory condition.  *See id.*

At J.P.'s four-month well-baby examination on September 14, 1999, the treating pediatrician described him as "well," and noted that he could sit, hold up his head, and babble.  *See id.*  The doctor discussed the risks and benefits of vaccinations with J.P.'s mother and, based on the previous HHE, gave J.P. only the diphtheria and tetanus vaccines rather than the DTaP vaccine, which also includes a component to prevent pertussis (commonly known as whooping cough).  *See id.* at *3.

At a visit on October 4, 1999, J.P.'s primary treating pediatrician, Dr. Turow, noted the possibility of a "strabismus" or "pseudostrabismus"[2] based on reports from

---

[1]   Under the Vaccine Act, a special master reviews each petition and issues a decision assessing whether compensation should be awarded.  *See* 42 U.S.C. § 300aa-12(c), (d).

[2]   Strabismus is commonly referred to as "lazy eye," in which a person's eyes are not properly aligned, usually because of a problem with the muscles around the eye. *See Special Master Decision*, 2009 WL 3288295, at *14. Pseudostrabismus is a similar lack of alignment brought about by causes other than a problem with the ocular muscles. *See Final Decision*, 88 Fed. Cl. at 184 n.17.

J.P.'s parents.  As a result, he recommended an ophthalmological consultation.  *See id.*  Dr. Rubin, a pediatric ophthalmologist, examined J.P. on November 10, 1999, finding J.P. to be a "healthy 6 month old baby" with no evidence of strabismus.  *See id.*  Dr. Rubin believed that any symptoms "would probably resolve spontaneously over the next several months."  *See id.*

At his sixth-month examination on November 8, 1999, J.P. was described as a "well infant," who had good head control and could grab objects well.  *See id.*  The doctor did note, however, that J.P. could not roll over and could not sit up without support.  *See id.*  J.P. was referred to another doctor for a left eye "deviation medially."[3]  *See id.*  Like at the four-month examination, J.P. received the diphtheria and tetanus vaccines but not the pertussis component.  *See id.*

On January 31, 2000, at his nine-month well-baby examination, J.P. was again described as "well," with the doctor noting that he could sit indefinitely without support, use a "pincer" grasp to pick up objects, speak basic syllables, wave, and play "peek-a-boo."  *See id.*  J.P. could not, however, pull himself up to stand or walk with the help of nearby support (known as "cruising").  *See id.*

On March 8, 2000, Dr. Turow noted a potential concern about J.P.'s "developmental progression."  *See id.* at *4.  J.P. was diagnosed with "fine & gross motor developmental delay" on March 27, 2000.  *See id.*  The examining specialist recommended physical therapy and monitoring.  *See id.*

---

[3]    A "deviation medially" is a strabismus in which an eye is pointed towards a person's nose.  *See Special Master Decision*, 2009 WL 3288295, at *15.

Two days later, an ophthalmologist observed and recorded a "vertical nystagmus."[4] *See id.* The next day, after J.P.'s mother told Dr. Turow that the vertical nystagmus appeared to be worsening, Dr. Turow referred J.P. to a pediatric neurologist. *See id.* During his examination of J.P., the neurologist attempted to elicit, but did not observe, any nystagmus. *See id.* On April 5, 2000, Dr. Rubin examined J.P. but also did not observe any nystagmus. *See id.*

The Petitioner filed a claim under the Vaccine Act on April 30, 2002, asserting that the DTaP vaccination administered on July 20, 1999, caused J.P.'s developmental delays diagnosed in March of 2000. *See id.* at *5.

### a. THE SPECIAL MASTER DECISION

After a prior decision and remand not before us in this appeal,[5] the Special Master concluded that the Petitioner had failed to establish the second and third prongs required under *Althen*, and was thus not entitled to compensation. *See id.* at *22–30. The Special Master found that J.P was developing normally from July of 1999 to March of 2000, at which point, the government concedes, he was suffering from a brain disorder known as an encephalopathy, and was developmentally delayed. *See id.* at *5, *8. The Special Master rejected the opinion, held by experts for the Petitioner, that J.P. was signifi-

---

[4]   A "vertical nystagmus" is a repetitive up-and-down fluttering of the eyes, usually associated with an underlying neurological problem. *See Special Master Decision*, 2009 WL 3288295, at *15.

[5]   These two decisions relate to, but are not directly at issue in, this appeal. They are: *Doe 21 v. Sec'y of Health and Human Servs.*, 02-0411V, 2008 WL 4679501 (Fed. Cl. Oct. 14, 2008), and *Doe 21 v. Sec'y of Health and Human Servs.*, 84 Fed. Cl. 19 (2008).

cantly developmentally advanced at two months. *See id.* at *9. While those experts assumed J.P. was rolling *over* (i.e., from front to back or vice versa), the Special Master pointed out that the pertinent notation actually reads that J.P. "rolls to side," an activity perhaps only slightly advanced at two months. *See id.* at *9–10. The Special Master also rejected the related view that J.P. was potentially experiencing developmental delays at four months because he was not "still" advanced at that time. *See id.* at *10–12.

As to J.P.'s condition at his six-month well-baby examination, the Special Master found that a preponderance of the evidence established that J.P. was developing normally, and that the failure to roll over or sit up without support merely demonstrated uneven development rather than delay. *See id.* at *12–13. The Special Master noted that Dr. Turow "could not express an opinion as to whether [J.P.] was developmentally delayed at six months" while Dr. Wiznitzer, the expert for the government, testified that he would have merely "monitored" a child in J.P.'s situation. *See id.* at *13. Moreover, the Special Master was not persuaded by the Petitioner's experts, Drs. Shane and Megson, who opined that J.P. was delayed at six months. *See id.* According to the Special Master, their opinions were based on the assumption that a six-month-old should sit without support even though "a preponderance of the evidence indicates that most babies achieve this milestone at seven-months." *See id.* Regarding the condition of J.P.'s eyes, the Special Master clarified the difference between strabismus and nystagmus, and stated that while "no credible evidence supports a finding that [J.P.] was suffering from a nystagmus in October and November 1999," "a preponderance of the evidence supports a finding that [J.P.] suffered from intermittent strabismus." *See id.* at *16, *18. Thus, the Special Master found that any eye conditions were

muscular, rather than neurological, in origin. *See id.* at *18.

The Special Master also found that while "a preponderance of the evidence indicates that [J.P.] was still developing normally" at the time of his nine-month well-baby examination, "some evidence indicates that [J.P.] had not reached one milestone," namely, J.P. could not cruise or pull himself to standing. *See id.* at *18. According to the Special Master, the experts supported the conclusion that J.P. was developing normally at this stage: Dr. Wiznitzer agreed that J.P. was developing normally but he would monitor him; Dr. Megson did not opine on delay, but instead noted the need for additional information about muscle tone prior to making an assessment; for his part, Dr. Shane did not give an opinion about J.P.'s development, believing the prior examination of J.P. was "limited." *See id.* For various reasons, the Special Master found Drs. Shane and Megson unpersuasive and not credible as to certain critical points. *See id.* at *19–21.

Based on these findings, the Special Master concluded that the Petitioner had not satisfied the second prong under *Althen* because there "is little persuasive evidence to show that the July 20, 1999 DTaP vaccine caused [J.P.'s] failure to develop normally." *See id.* at *23. Specifically, the Special Master reasoned that, despite slightly missing two developmental milestones, J.P.'s otherwise normal development through the six-month well-baby examination "is not consistent with a child who had developed an encephalopathy on July 20, 1999." *See id.* To demonstrate the lack of causation, the Special Master highlighted the testimony of Dr. Turow, who stated that "it was not impossible" that the DTaP vaccine caused the developmental delays, but would go no further. *See id.* at *25. According to the Special Master, neither this testimony nor the other evidence set forth by the Petitioner satisfied the second prong. *See id.* at *25–26.

The Special Master also concluded that the Petitioner had failed to establish prong three of *Althen*—a proximate temporal relationship between the vaccination and the injury. *See id.* at *26. First, the Special Master found that the Petitioner had failed to present *any* evidence about the time frame that medical science would expect an injury caused by a vaccine to be manifest. *See id.* at *26–27; *see also de Bazan*, 539 F.3d at 1352 ("Thus, the proximate temporal relationship prong requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact."). Second, the Special Master found that the Petitioner had failed to establish that J.P.'s symptoms fell within the unidentified medically appropriate time period because, for the reasons noted above, J.P. was developing normally through March of 2000. *See Special Master Decision*, 2009 WL 3288295, at *27–30. The Special Master made no finding as to *Althen* prong one. *See id.* at *22.

### b. THE FINAL DECISION

On review of the *Special Master Decision*, the Court of Federal Claims determined that the Petitioner had established all three prongs under *Althen*, and thus remanded for an award of compensation. *See Final Decision*, 88 Fed. Cl. at 198–202. As to the first prong, the court held that the Petitioner had established a "medical theory causally connecting the vaccination and theory" because the Vaccine Injury Table indicates that DTaP vaccines can cause encephalopathy—a causal connection "well recognized by the Office of Special Masters." *See id.* at 199.

Regarding the second prong, the Court of Federal Claims found sufficient evidence of a logical sequence of cause and effect for three reasons. First, the court found support in Dr. Turow's testimony because causation can be found "even where the treating physician cannot

unequivocally state that the vaccination caused the injury." *See id.* at 200 (citing *Andreu v. Sec'y of Health and Human Servs.,* 569 F.3d 1367, 1375–76 (Fed. Cir. 2009)). The court found that "[a]lthough Dr. Turow did not testify that the July 20, 1999 vaccine definitely caused Petitioner's condition, he 'believed' that was the case here." *See Final Decision*, 88 Fed. Cl. at 200. Second, the court noted that "there was no other evidence that explained [J.P.'s] injury." *See id.* Third, the court was persuaded by the fact that, after administering the pertussis component in the first vaccination, J.P.'s treating physicians did not administer that component in later vaccinations, instead only administering the diphtheria and tetanus components. *See id.* at 201.

The court found the proximate temporal relationship required under the third prong of *Althen* satisfied because the government conceded that J.P. had suffered an HHE after receiving the DTaP vaccine. *See id.* at 199. The court also found that J.P.'s medical records showed signs of developmental delay as early as November 1999. *See id.* at 202. First, the court determined that, based upon its review of the medical records, "by October 4, 1999, nystagmus may have been present, but escaped Dr. Rubin's attention or simply was misdiagnosed." *See id.* Second, the court found that J.P.'s failure to roll over or sit up without support was not a sign of uneven development, as the Special Master had found, but rather a "digression" that represented "a missed developmental milestone." *See id.* Having found causation, the court reversed and remanded to the Special Master for an award of compensation. *See id.* at 202. The Special Master awarded $2,431,153.51 for life care expenses for the first two years after judgment, $75,000 in compensation for past unreimbursable expenses, and an amount sufficient to purchase an annuity contract.

The government timely appealed the judgment of the Court of Federal Claims awarding compensation. This court has jurisdiction pursuant to 42 U.S.C. § 300aa-12(f).

### III. STANDARD OF REVIEW

In Vaccine Act cases, we review *de novo* a decision by the Court of Federal Claims, applying the same standard of review as that court applies in reviewing a decision of a special master. *See Porter v. Sec'y of Health and Human Servs.*, 663 F.3d 1242, 1248–49 (Fed. Cir. 2011); *Hazelhurst v. Sec'y of Health and Human Servs.*, 604 F.3d 1343, 1348–49 (Fed. Cir. 2010). Under that standard, we uphold factual findings that are not arbitrary and capricious and review legal conclusions to assess whether they accord with the law.[6] *See Moberly*, 592 F.3d at 1321; *see also Munn v. Sec'y of Health and Human Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992) (clarifying the standard set forth in 42 U.S.C. § 300aa-12(e)(2)(B)).

The arbitrary and capricious standard provides a fact finder the most deference possible. *See Munn*, 970 F.2d at 870. Under that standard, "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences, and articulated a rational basis for the decision, 'reversible error will be extremely difficult to demonstrate.'" *See Hazelhurst*, 604 F.3d 1343 at 1349 (quoting *Hines v. Sec'y of Health and Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)). In other words, as long as a special master's factual finding is based on record

---

[6] The Petitioner relies on *Hines v. Secretary of Health and Human Services*, 940 F.2d 1518, 1523 (Fed. Cir. 1991), for the proposition that this court reviews factual findings for "clear error." *See* Appellee Br. 30. The cited discussion from *Hines* makes clear, however, that, after statutory amendments made in 1989, that less deferential standard no longer applies to factual findings by a special master.

evidence that is "not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." *See Lampe v. Sec'y of Health and Human Servs.*, 219 F.3d 1357, 1363 (Fed. Cir. 2000). A court reviewing a special master's decision should not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *See Porter*, 663 F.3d at 1249.

## IV. ANALYSIS

On appeal, the government argues that the Court of Federal Claims legally erred by substituting its own factual findings for those already made by the Special Master. According to the government, the court should have deferred to the Special Master's findings, which were never explicitly found to be arbitrary or capricious. The Petitioner responds that the first symptoms of delay should be deemed the onset of a vaccine-related injury, even if the first symptoms predate the diagnosis of the injury. Here, according to the Petitioner, the eye movements reported by J.P.'s parents in October of 1999, as well as the potential indications of motor skill delays in November of 1999, represent early evidence supporting a finding that J.P. was, in fact, suffering from an encephalopathy soon after the first vaccination.

Based on the record, we agree with the government and conclude that the Court of Federal Claims erred in rejecting the Special Master's determination that the Petitioner failed to demonstrate entitlement to compensation. To resolve this appeal, we only need address the second prong under *Althen*—a logical sequence of cause and effect showing that the vaccination was the reason for J.P.'s developmental delays. We will first explain why the findings in the *Special Master Decision* regarding prong two were not arbitrary or capricious and why his legal

conclusions accorded with the law. Then we will turn to the analysis of the Court of Federal Claims in the *Final Decision*.

## a. THE SPECIAL MASTER DECISION

As noted, the Special Master's determined that the Petitioner failed to establish the second prong under *Althen*—a logical sequence of cause and effect. *See Special Master Decision*, 2009 WL 3288295, at *22–26. The government has conceded two of the three necessary links in the causal chain: (1) that the DTaP vaccine caused the HHE on July 20, 1999, *see id.* at *2; and (2) that whatever caused the encephalopathy (which the government admits was present by March of 2000) also caused the developmental delays, i.e., the relevant injury to J.P., *see id.* at *5. The issue here is whether the vaccination (or HHE) caused the encephalopathy and developmental delays. For the following reasons, we conclude that the Special Master's determination that the Petitioner failed to show this linkage by a preponderance of the evidence was not arbitrary or capricious, or tainted by legal error.

In his decision, the Special Master conducted a thorough review of the relevant evidence, including the testimony of the expert witnesses, and concluded that the medical records did not support a finding that J.P. developed an encephalopathy at the time of the HHE. *See id.* at *23. In reaching that conclusion, the Special Master provided a reasoned explanation for crediting the government's expert, Dr. Wiznitzer, who testified that the failure to roll over and sit up without support at the six-month examination were not signs of an encephalopathy beginning in July of 1999. *See id.* at *12–13. The Special Master found additional support for his conclusion in a note from a pediatric neurologist, Dr. Eviatar, who wrote that "[i]t is my medical opinion that [J.P.'s] developmental delay and immature eye movements are the result of congenital hydrocephalus and Arnold Chiara malfor-

mation . . . and are not related to [diphtheria-pertussis-tetanus] encephalopathy." *See id.* at \*24. Further, the Special Master highlighted the testimony of Dr. Turow, who "was quite clear that he could not say that the DTaP [vaccine] caused the developmental delay." *See id.* at \*25 (citing testimony at J.A. 388–90). Under the highly deferential standard applicable here, the Special Master's reasoned conclusions regarding prong two of *Althen* were not arbitrary or capricious, and should be upheld. *See Hazelhurst*, 604 F.3d at 1349; *Lampe*, 219 F.3d at 1363.

b. THE FINAL DECISION

We turn now to the analysis in the *Final Decision* regarding the second prong of *Althen*. *See Final Decision*, 88 Fed. Cl. at 199–201. In that regard, we conclude that the Court of Federal Claims generally failed to apply the highly deferential standard applicable to its review of the *Special Master Decision*; rather than assessing whether the Special Master's findings were arbitrary and capricious, the court instead reevaluated the evidence and came to its own findings. This constitutes legal error. *See Munn*, 970 F.2d at 870 ("The Claims Court owes these findings and conclusions by the special master great deference—no change may be made absent first a determination that the special master was arbitrary and capricious."); *see also Porter*, 663 F.3d at 1249 (cautioning a reviewing courts not to "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses"); *Hazelhurst*, 604 F.3d at 1349 (noting that a reviewing court may not "second-guess the special master's fact-intensive conclusions, particularly where the medical evidence of causation is in dispute").

One example of the court's reweighing of the evidence here is its reliance on the testimony of Dr. Turow as one of the three bases supporting a finding of a logical se-

quence of cause and effect between the vaccination and the injury. When discussing the potential causation between the vaccination and the developmental delays in J.P., Dr. Turow stated that it was "not impossible," but that he did not "have concrete evidence to connect the two." *See Final Decision*, 88 Fed. Cl. at 200 (excerpting the relevant testimony). The Special Master relied on this same testimony to support a finding that the Petitioner did not establish causation. *See Special Master Decision*, 2009 WL 3288295, at *25 ("Like Dr. Turow's written statements, his testimony falls short of the standard of evidence that supports a finding of 'a logical sequence of cause and effect.'"). The Court of Federal Claims, however, reinterpreted Dr. Turow's testimony to support causation, finding that he, in fact, "believed" that the vaccination caused J.P.'s condition.[7] *See Final Decision*, 88 Fed. Cl. at 200. In so doing, the court erred first by failing to explain why the Special Master's contrary finding was arbitrary or capricious, *see Munn*, 970 F.2d at 870, and second by improperly reweighing the Turow testimony, *see Porter*, 663 F.3d at 1249.

In its analysis, the court also erred, we think, in its application of this court's decisions in *Andreu v. Secretary of Health and Human Services*, 569 F.3d 1367 (Fed. Cir. 2009), and *Capizzano v. Secretary of Health and Human Services*, 440 F.3d 1317 (Fed. Cir. 2006), to support its finding regarding the second prong. *See Final Decision*, 88 Fed. Cl. at 199–201. The court relied on *Andreu* for the proposition that "the testimony of a treating physician

---

[7] At oral argument, counsel for the Petitioner conceded that this finding by the Court of Federal Claims was "a clear mistake." *See* Oral Argument at 13:10–13:50, *Paterek v. Sec'y of Health and Human Servs.*, No. 2012-5078 (Fed. Cir. Apr. 5, 2013), *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2012-5078.mp3.

can establish a logical sequence of cause and effect, even where the treating physician cannot unequivocally state that the vaccination caused the injury." *See id.* at 200 (citing *Andreu*, 569 F.3d at 1376). This overstates the weight of equivocal testimony, such as Dr. Turow's. In *Andreu*, one physician had already testified *unequivocally* as to causation, leaving the equivocal testimony from another physician to merely provide some additional support. *See Andreu*, 569 F.3d at 1375–76. Thus, *Andreu* does not stand for the proposition that equivocal testimony *alone* can establish causation. More importantly, as reasonably concluded by the Special Master, *see Special Master Decision*, 2009 WL 3288295, at *25, Dr. Turow's testimony that causation was "not impossible" fails to provide support for causation at all. As this court has previously held, the statutory standard requires more than just "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury." *See Moberly*, 592 F.3d at 1322.

We also find error in the court's application of *Andreu* and *Capizzano* to the two other bases relied on by the court to support the finding that the Petitioner established the second prong: that "there was no other evidence that explained [J.P.'s] injury" and that J.P.'s treating physicians withheld future administration of the pertussis vaccine. *See Final Decision*, 88 Fed. Cl. at 200–01 (citing *Andreu*, 569 F.3d at 1375–77 and *Capizzano*, 440 F.3d at 1326). In both *Andreu* and *Capizzano*, unlike here, the treating physician affirmatively concluded that the vaccine did, in fact, cause the injury. *See Andreu*, 569 F.3d at 1376 (noting that the relevant expert "stated unequivocally" that he believed that the vaccine caused seizures); *Capizzano*, 440 F.3d at 1326 (holding that "the chief special master erred in not considering the opinions of the treating physicians who concluded that the vaccine was the cause of Ms. Capizzano's injury"). In the absence of an affirmative conclusion as to causation, the lack of an

alternative cause does not, alone, satisfy a petitioner's burden. *See Althen*, 418 F.3d at 1278 (stating that "neither a mere showing of a proximate temporal relationship between vaccine and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation"); *Hodges*, 9 F.3d at 960.[8] Similarly, given Dr. Turow's testimony, the decision to withhold future administration of the pertussis vaccine provides little probative evidence of causation. *See Andreu*, 569 F.3d at 1376–77. For these reasons, we conclude that the Court of Federal Claims erred in finding the second prong under *Althen* satisfied.

Lastly, we briefly address the conclusion that the Special Master committed legal error by allegedly engaging in a "[s]elective review" of J.P.'s medical records. *See Final Decision*, 88 Fed. Cl. at 201. We can discern no basis for this conclusion. Although the Special Master did state that "[t]he details of most events in [J.P.'s] medical history after April 2000 are generally not relevant to determining whether the July 20, 1999 DTaP vaccination caused [J.P.'s] developmental delay," he also made clear that "[a]lthough details of [J.P.'s] medical history after April 2000 are not set forth in this decision, these details appear in the two previous opinions and *have been considered*." *See Special Master Decision*, 2009 WL 3288295, at *5 (emphasis added). Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered. This alleged error of law was not a proper basis to reverse the Special Master.

---

    [8] We note that while causation cannot generally be based on the mere lack of an alternative cause alone, a petitioner may affirmatively rule out other possible alternative causes to prove causation-in-fact. *See de Bazan*, 539 F.3d at 1352 n.3.

For these reasons, we reverse the judgment of the Court of Federal Claims and remand with the instruction that the court affirm the Special Master's determination that the Petitioner is not entitled to compensation.

**REVERSED AND REMANDED**

COSTS

No costs.